This is a case which really presents two issues. The first is whether the Board of Immigration Appeals decision in which it reversed the immigration judge's grant of lawful permanent resident status through an application for cancellation of removal under section 240 A.B. of the Immigration Nationality Act is ultra-various in that it exceeds the Board's scope of lawful authority. The second is whether the Board of Immigration Appeals committed a denial of due process in reversing the immigration judge's grant of relief rather than remanding the case to the immigration judge for an evidentiary hearing under the new standard for establishing exceptional and extremely unusual hardship which did not exist at the time of the immigration judge's decision. This court in the case of Noriega-Lopez v. Ashcroft stated that the present statute specifies in no uncertain terms that it is IJs, immigration judges, who are to issue administrative orders of removal in the first instance. There's no indication in the statute that the BIA may do so. Under the statutory scheme, they're talking about INA section 101A47, only an IJ or another administrative officer designated by the Attorney General, a provision not applicable here, may issue such orders. Noriega was a habeas case, wasn't it? Yes. Does that make any sense? Well, it dealt with a ‑‑ Let me finish my question so you can formulate your answer. Okay. Does the fact that it was ‑‑ that proceeding was habeas make any difference in terms of whether Noriega-Lopez's holding applies to this case? I don't think so, because they're referring to the statutory language as to which body has authority to, you know, the trier of facts issues the first order of deportation. And they're really stating in Noriega that basically the BIA is a true appellate body. So that where the Board of Immigration Appeals disagrees with the immigration judge's decision, the proper course of action is to remand it to the immigration judge with instructions for a fine. Excuse me. We've read Noriega, so we know what it says. I'm just wondering, what practical difference does it make? I mean, let's say the board here had done what you say they should have done. And just for, you know, help me along if I'm wrong, but what I imagine would have happened is they would have gone back to the IJ, and the IJ would have had no choice but to enter a remand order because the board had ‑‑ I'm sorry, to a removal order because the board had said that's what the IJ is supposed to do. And then you would ‑‑ correct me if ‑‑ you can stop me at any point. If I am imagining things incorrectly, the sequence, feel free to stop me. Well, I would think that if they remanded it back with instructions saying ‑‑ in this case, the board cited Monreal v. Ashcroft, which was the first case discussing exceptional and extremely unusual hardship, which came out a week after the immigration judge's decision, and said this is what the law is, this is what the standard is. And, you know, what they should have done, I believe, under Noriega is remand it back to the judge with instructions saying this is the proper standard, apply it to this case. Now, it may be that ‑‑ That is your separate argument that the standard is new and your client should have had a chance to apply the approver. I understand that argument. And we can talk about it in a minute. But as it happens, the board here, for better or for worse, rightly or wrongly, ended an order saying we've applied the new standard. Mr. Molina loses under the new standard. Again, you're disputing that and we can talk about whether it should have been remanded for application of the new standard, but just accept that part of the ruling as given. So we have applied the new standard, and under the new standard, Molina loses and has to be removed. What I imagine, again, stop me if I go off the track here somewhere, is that the IJ would have no choice but to enter a removal order. The next step would be for you to appeal that order to the BIA, the BIA having only six months earlier or whenever said this is what's required to be done, would have nothing to, no quarrel with IJ, because IJ did exactly what he was ordered to do. And then you'd be up here arguing exactly the same thing you're arguing today. So is this just sort of a pointless exercise? You read Molina Camacho as... No, I don't think... I'm sorry. I mean, the case we're discussing, is that case that Noriego Lopez is sort of an exercise of utility? No, I don't think it is. I mean, they basically, they applied the law that Congress wrote. Congress says, you know, we specify that it's immigration judges who have the authority to issue these... I understand that's what the law is, or what the law says. I'm actually just asking about the practical consequences. Is this all a minuet that has, is the thing that Noriego Lopez said and the thing that you say should have happened just an exercise in filing more paper and having more people... Does it have any practical consequence? It may be required, nevertheless. That's a different decision on the case. I think in an instance where the, even if it was not a new law, even if it was old law, and the Board of Immigration Appeals had sent it back saying that we feel the judge did not apply the proper standard, you know, our base, on our review, the decision was an error. The judge, that doesn't mean that necessarily that the judge is going to apply the proper standard and say that, you know, the Board has remanded the case with instructions as to how this case is to be decided. Could, could, but that would be a different case. There would be a case where the Board decides, for better or for worse, we are not going to apply the standard. We're going to let the IJ apply the standard. And in that case, they wouldn't enter a remand order because, of course, they would have decided the IJ needs to exercise discretion. But I'm talking about a case like ours where the Board says there's no discretion to exercise. We have exercised our discretion. We have decided that applying the standard is a matter of law. Petitioner is removable. And the only thing that's going to happen from now on is he's going to be removed. Is there any practical difference between saying we are going to enter the order ourselves and saying you're going to have to issue an order of removal, and then the IJ goes back to us and then goes to the Ninth Circuit? If the decision is that, I mean, here, the Court did not consider the Noriega. It did not consider the statute as to who has the authority to issue the initial order. So if it's sent back, I think that under those circumstances, and they say you have to issue an order of removal, well, then that's true. That would be a case where the IJ would enter it, and it would have to come back up. Now, in Noriega, they're looking at a case where the Court looked at the Board of Immigration Appeals entered an order of removal, and they said, well, the statute doesn't provide for that. So it's really a matter for Congress to deal with. So I understand your position. It's, first, that Noriega-Lopez applies to this case. Yes. Yes. And that its application means that the BIA's order of removal was ultra veris, not allowed pursuant to the statute, and the matter ought to go back to the IJ. Right. Period. Right. Now, your additional argument is that the – I take it it's your argument that that ought to happen in any case where – let me finish. That ought to happen in any case where the BIA does this. Is that right? Yes. Okay. But you additionally argue in this case there are additional reasons for it to go back to the IJ because there's a different legal standard to be applied. Yes. That's correct. And I would point out the – in Noriega, there were different facts. And the BIA noted that they're dealing with a situation in which the immigration judge had terminated a proceedings finding that the ailing was not removable as charged. Judge Kaczynski asked it to you about a practical question. Let me ask you the same kind of question. I take it you normally represent Petitioners? Yes. Aren't these cases where IJ's grant and the BIA reverses especially the current BIA the most meritorious cases we're likely to see? I would think so. Why wouldn't we want to deal with them now instead of waiting another three years? As far as this Court? Well, I mean, the difficulty there is that there have been several holdings that the courts of appeal do not have jurisdiction to decide purely discretionary forms of relief. If we're just three judges and if Noriega applies, it applies, and in-bank proceedings would be necessary to change that, if that's correct. But a number of the other circuits have looked at the practical considerations that Judge Kaczynski pointed to, haven't they? In coming, there is a – if Noriega-Lopez says what you say it says, there's a circuit split, isn't there? There's a what? Circuit split. Well, maybe you're right. Some other circuits have looked at this very issue and for the same practical concerns that Judge Kaczynski has identified have said, well, you know, that may be the technical meaning of it, but this is absurd, it's not practical. We're going to say it's okay for a court of appeals to go ahead and treat that as a final order and conduct their review, right? Right. But that has not been the – there's no decision that I'm aware of in the Ninth Circuit which would – But other circuits have done that. Yes. And for you – no, on to – for you and your client, time is hope. That's correct, Your Honor. So it goes back and then maybe it'll come forward, take some time, maybe we got a new BIA, maybe we have an amnesty, maybe we have a sea change, who knows? Hope reigns eternal, right? I would agree with that, Your Honor. Okay. So that's what we're hearing about, in a sense. Well, that's one issue. And as far as for Mr. Molina Camacho, that is a matter. But then again, we would have to hold Congress to the – if they write the law in a certain way and designate that, you know, a certain body has authority to – an exclusive authority to do certain functions, and I believe that that's what we're held to. Do you want us to be strict constructionists? Well, they did mention in this case that they were going to leave for another day situations in which an immigration judge determines that an alien is removable but grants relief from removal and then the BIA rejects the grant of relief. That's today. That's today. That's today. And I'm just going back to looking at the statutory language and also the language in which the BIA in its sole appearance is restricted to affirming such orders, not issuing orders of removal in the first instance. So I don't know that that language really lends itself to an alternative interpretation. But that – that is my first argument. If I could get into the second – well, I don't – if the Court has questions. But my position would be that based upon the statutory language in 101-847 and the Court's holding in Noriega, that the BIA's decision in this matter would be ultra viris and that the proper process would be for it to – remanded to the immigration judge with whatever instructions the Board may – may give. Now, the second matter is that at the time that the immigration judge made the decision, the Board had not yet defined and set forth requirements for meeting the burden of demonstration. There was no standard announced. No. So I'm having a little difficulty figuring out how – sort of announcing a standard now. I mean, it would be one situation if – if there had been one standard announced. Right. And the Board had that change of standard. He said, look, you've moved the target on us. You know, we're aiming low and, you know, they raised the bar. We might have put in more evidence. But since the standard was uncertain, wouldn't we have to presume that your client, you – where you counseled before that, whoever the lawyer was, would have put in all the evidence available because you didn't know how high you had to aim? And that happens sometimes. Standards are unclear and you need a definitive ruling. You don't have a definitive ruling. And so I'm not exactly sure why – what the prejudices in – No one knew – when the law came out, it came into effect April 1st, 1997. It said exceptional, extremely unusual hardship. And the private bar is one. Does that mean bizarre? Does that mean that you have to show that the qualifying relative hasn't – No, I mean – And so it was – it was an open question. And here the judge said, look, the only case we have, the only standard we have is for suspension of deportation cases under old INA section 244A1. This person meets – and she enumerated them under matter of Anderson and said, here are seven of them. This person clearly meets five. It's clearly above – But did she do this before the evidence or afterwards? After reviewing the evidence. Okay, so here you are. You're confided with a new standard. Right. You don't know what – how it's going to be interpreted by the IJ or by the board. And unless you want to say there's a rule that before there's a definitive ruling by an appellate body, everything – every time you have a new standard, you get two trials, because after all, you don't know exactly what the standard is. You knew that there was a language that – that was arguably higher – that required more than the old standard. What prejudices are saying, well, you can read the standards as well as everybody else. The IJ got it wrong. She used the old standard. But she did it after you put in your evidence. It's not like it's her prejudice. It's not like she gave you an advanced ruling and said, look, you don't have to end very high because I'm going to apply the same old standard. You know, you could read the language as well as anybody else. But that's a very heavy burden to place upon the alien. And this court has criticized the board. What's heavy about that? People go to trial in criminal cases with new statutes all the time. You don't say, oh, well, you can't get tried criminally because we don't know exactly what the standard is. I mean, it's retroactive. And there's an excellent dissenting opinion by Board Member Rosenberg in the Monreal case discussing that and talking about fundamental fairness in an alien being able to have a fair hearing and present evidence on behalf of their claim. But nobody stopped your client from putting in evidence. Nobody said this is irrelevant under the new standard. I object. The evidence is excluded. A new standard is passed by Congress. It looks different than the old standard. Counsel can put in as much evidence as possible. Nobody said, oh, you know, you can't put it in. And then the IJ gets it wrong. She makes a ruling and she says, I'm applying the old standard. But what she does after you've put in your evidence really doesn't go to due process at all. But, I mean, it's vague. Here we have a new standard, you know, that is not defined. Well, what do you have other than the fact that you've got a new standard? And unless you can take the position that every time you have a new standard you get two trials, once when you try the case, and the second time when the standard is announced on appeal, it strikes me as a sort of bizarre position. What have you got? Here, if they feel that the standard was not applied correctly by the immigration judge and that this is what the term means. That's what she thought it means. That's why we have appeals bodies. Let me ask you this. You think that based on the evidence that was introduced before the IJ that had you had this newer standard, that the IJ would have concluded that the evidence met the newer standard? Well, I mean, I think so. And I think that the alien is entitled to an evidentiary hearing, you know, under the correct standard of law in order to make that case. You're not just asking for a remand for the IJ to pass on the new standard. You want to put in more evidence. But what reason is to believe that you didn't get to put in as much evidence as you had? Because, I mean, this clearly would have been a case that would have been granted for suspension of deportation under the old law. And as far as what else was required... But you knew there was a new law that was phrased in very different terms. It was phrased in very different, in quite unusual terms, too. Exceptional, extreme. It was extreme hardship. Extreme hardship standard, you know, as far as what... It was clear what had to be shown in that. Extremely exceptional. Exceptionally unusual. Yeah, whatever. You have to find a twist where it's not only unbearable misery, but it has to be something that would be... If everyone is starving, you have to show that there's something that this person has another ailment which puts a bizarre twist on it. That's... But that's what Congress passed. You knew that it was a new standard. There was no advance ruling that said you can't or shouldn't put in evidence. I guess, I don't see what the due process...  That was in the context of a motion to reopen where there was a change and where there's a new standard that the proper matter is for... To comport with fundamental fairness and due process, the ailing has to have an opportunity to have a hearing... If you change the standard on appeal, I can understand that. But here you had Congress change the language. The IJ, just like you, just like counsel for the government, was faced with a new pronouncement from Congress. And except for saying, every time you have a new statute, we get two trials, not one. I don't see how you get a... I mean, this would apply any time Congress changes the standard in any way. I see a parallel between this and Castillo-Viagra versus INS back in 1992. Back in the early 90s... I don't even remember that case. Tell me about it. Well, there were hundreds of Nicaraguan asylum appeals pending before the Board of Immigration Appeals in the early 90s. And then there was an election in 1990 and Sandinistas were voted out. And the Board of Immigration Appeals took all these cases and said, oh, Sandinistas are out of power. Any asylum claims which are based upon fear of the Sandinistas, they just summarily dismissed them. And this court came back in Castillo-Viagra and said, you know, that's not proper. Where there's been a change in circumstances? Here we have change in the law. And you just can't take all of them and just say, en masse, they're all... Let me just make sure I understand. The change in that case came by the Board after the cases were tried before the IJ. Right. Here you have a change. Congress has changed the law. Congress has given you a new standard. And you knew about this new standard before you go into the hearing. You see it's worded differently. Nobody knows exactly what it means. And nobody... You know, you don't ask for an advance ruling and say, you know, what evidence... There's no restriction in what evidence you can put in. I don't... This is not a situation where they change the standard after you've tried the case. This is a case where the standard changed before you tried the case. You just didn't have an expectation as to what that means from an appellate body. And I think that the alien would be entitled to an explanation of what that means in order to have a fair opportunity to prepare their case. In other words, you're entitled to two trials whenever Congress changes the standard. That's your position. Right. I just don't see any way you get to where you want to go without taking that position. The Board should come out with guidelines or a pronouncement or decide a decision. How do they try to describe these cases unless they get an appeal? They're not a regulatory body. The only way they can announce a standard is to have a case come to the system under the new standard and for them to review it. You're saying that case gets two trials no matter what. I think from the period between where the term is put down and where the decision is deciding, defining what the law is, that would be the matter, yes. Those cases get two trials. That's an unusual position. But at least it's consistent. Yeah, it's just more business, huh? Well, I mean, in the cases, particularly ones where they're granted, I mean, and the immigration judge, the immigration judge found that under the new standard, this is correct, too. You know what Dickens said? He said the overarching principle of the English law is to always keep itself in business. So you're right in line. Right. And we're dealing with somebody who's been in this country since 1984, U.S. citizen child, facing probably a matter of absolute poverty, far more substantial ties to this country than to Mexico. And so he has a tremendous amount at stake. And I think the due process in a matter like that, you know, I think part of the reason for Custodia Viagra is because they were dealing with asylum claims and the consequences, if you're talking about someone being persecuted upon their return, that they said that there's... Alfie, you're over your time. But if you want more hope, go see the movie The Day After Tomorrow. I haven't seen that one yet, Your Honor. Haven't you? I haven't seen it. I've just seen the clippings, the, you know, the previews. That's pretty much the movie right there. Okay. Save the nine and a half bucks. I didn't see the clippings, but it's a great movie. Let's hear from the government. Thank you. Let's hear from the government. Okay. Thank you. Good morning, Your Honors. May it please the Court. My name is Aviva Poxer for the government. You can't stay away, can you? It's too much fun. Your Honors, the instant petition... Don't say that too quickly.   Your Honor, the instant petition... Don't say that too quickly. First of all, because this Court lacks jurisdiction to review the Board's discretionary determination that Petitioner failed to establish exceptional and extremely unusual hardship. Before you get wound up in your script there, why don't you start by telling us what the government's position is with respect to whether Noriega-Lopez applies to this case? Certainly, Your Honor. Again, in Noriega footnote 10... We know exactly what... Okay. Why don't you start by just telling us what your position is? Our position is that Noriega-Lopez is distinguishable. Noriega-Lopez dealt with a situation where removability was at issue. The Petitioner in Noriega ultimately was ordered removed by the Board before he had the opportunity to apply for relief because the question turned on the Court's jurisdiction based on his criminal conviction and whether it eliminated the Board's jurisdiction. In Noriega, you had a situation where the alien was not allowed to apply for relief, which he probably should have been considering the Court's determination on his removability. In this case, Petitioner conceded removability from the very beginning. Removability here was never at issue. What, for purposes of statutory construction, what's the difference between removal and asylum? Between removal... Yeah, what's the difference between, on the one hand, cancellation of removal, withholding of deportation, etc.? Well, there's basically... Is there a different statutory provision that says, in a case like this, that the BIA does have the authority to order removal? If you look at 1101A47 of the statute that talks about when proceedings become final, it says, upon an order of the Board of Immigration Appeals or at the time when the appeal period expires. That seems to indicate that the Board is, again, the final arbiter or court for the purposes of these cases. In addition, the Code of Federal Regulations talks about the Board's, at 1003.3, talks about the Board's standard of review, de novo, clearly erroneous, etc. So there is authority in the statute to indicate that the Board can and does do such types of orders. In addition, in this case, the due process claim is without merit. Petitioner was aware that this... Let's go back to what you just said. Your position is that a different statutory subsection controls this case than controlled Noriega-Lopez? Well, I think that it's the same statute. I mean, 1101A47A and B were mentioned in Noriega, but because of the posture of the case, the removability here was not at issue in the way that it is in Noriega. What we're talking about here is a concession of removability followed by a full and fair hearing on relief, which was overturned by the Board, the grant of relief. In this case, Petitioner has never said that he would have presented more evidence, additional evidence, that he withheld evidence. I'm not, in my question, I'm not to that point yet. I'm still trying to pin you down, if that's possible. Are you telling me that the statute, the jurisdictional bar in Noriega-Lopez, the statute relied upon by the Court in that case, is a different statute than applies to this case? No. I mean, it's the same. It's the same statute. Right. Is it a different subsection? No, it's not a different. Noriega-Lopez footnote, whatever it is, read together, as I understand it, you correct me if I'm wrong, says that the BIA doesn't have the authority to issue the order that it did in that case, correct? Right, the Removability Order. And you say this is different? Yes. Although the exact same statute is involved? Yes. And it's different because a different phase of the process was at issue in Noriega than it is here. Is there a different section of this statute that defines final order or the authority to issue a final order in the context of this case? It's the same statute, isn't it? Yes. And again, we're relying here on 1101A47A and B. Particularly B talks about the order becomes final upon a determination by the board affirming such order, or in this case, reversing such order. But again, the issue here is not removability. The issue here is relief. Removability here was conceded so that the statute can be interpreted differently than it was in Noriega. Basically here, what petitioner is asking you to do is reweigh the evidence. He tries to couch it as a due process claim. But what we're really talking about is that he wants this court to reweigh the evidence in cancellation, which was a discretionary determination, which this court has found itself that it lacks jurisdiction to do. And in addition, what I noticed is that petitioner discussed Monreal in his brief to the board. He was obviously aware of what the standard was, and he didn't challenge it in his brief to the board either. He seems to accept that that was the standard. And in addition, he can't demonstrate that he was prejudiced by the application of the board to new cases when what we're really talking about is a legal standard that was enacted in 1996. The immigration judge's decision in this case was dated 2001. Accordingly, this wasn't a new standard in the sense that the board created some kind of standard that wasn't already in the statute. The new standard had been in play since 1997, and accordingly, he had as much notice of the standard as he could have had. He had as much notice of the standard as any other alien in this situation had. In addition, he compiled quite a voluminous record for the purposes of qualifying for cancellation. Four witnesses testified at his cancellation hearing. The judge allowed him to present whatever evidence he felt was relevant, and it just doesn't make sense that an alien who wants to remain in the United States, who is seeking the opportunity to live here legally and permanently, would withhold evidence. It's illogical that he would do that in this type of situation, particularly if, as he says, the standard had changed somehow and that he was not aware of it. Wouldn't he jump as high as he could to reach that? You know, what's illogical or what isn't, that depends on his counsel and how his counsel handled these cases and all the rest of it. You know, that's the way they worked. Most of those things that we see, the transcripts, in many cases, counsel's not very good. Well, I mean, to the extent that that may or may not have been the case, he hasn't asserted an effective assistance of counsel below or anywhere else. But, you know, we don't get perfection out of the government. I don't think we expect perfection out of counsel for the alien in these cases. No, Your Honor, that's true. But in this case, he's never told us at any point what he would have done differently, what he would have submitted that he didn't submit, what exactly he would have done to counteract the supposed prejudice that he suffered. He didn't ever tell us anywhere what exactly was missing from his case that he would have otherwise put on if in fact he had known what this alleged new standard was. And he's never also claimed, he claims that due process, he claims that he was prejudiced, but he never said that he would have succeeded if the case had in fact been remanded or if the board had not applied this new standard, et cetera. He hasn't told us, well, I would have otherwise won if this had been done differently. Basically, what he wants is, as, you know, as Justice Kaczynski was saying, he basically wants to put on some more evidence to see maybe this time he can prevail. But that's not what these proceedings are for. He doesn't get another bite at the apple because he didn't come out on top this time, which is essentially what he's telling this court. And in addition, if this court were to find that every time the board issues a new decision that cases need to be remanded, we're going to be in an endless loop of litigation where absolutely nothing will be final in these cases. This court, for example, issues new decisions all the time. That doesn't necessarily mean that every single case that this court decides requires that all other similar cases be remanded. That's going to create an untenable situation. And Congress has expressed its intent to streamline these proceedings and, in the interest of all parties, to finalize them fairly but also expediently. And in these types of situations, we're going to be looking at cases that simply never end. And again, that's not, that is, again, not what Congress intended in this case or in any similar case. We normally have to deal with what they say. And if what they say is plain, does it matter what they intended? Well, the intent as to ultimately, what I'm referring to, Your Honor, is the intent to ultimately streamline these types of cases to basically, basically to bring finality to these types of opinions. But again, in this case, you're right, Your Honor, there absolutely was a standard that was in play at the time of his immigration court proceedings. And, in fact, the standard had already been in place since 1997. We're talking about a 2001 hearing. If your opponent is correct that Noriega-Lopez controls this case, then the problem is at Congress's door, right? Excuse me? I didn't hear that. If your opponent is correct that Noriega-Lopez controls this case because the BIA didn't have the authority to enter the order that it did, then the fix is in the hands of Congress, right? Yes, I think that would be correct, Your Honor. Congress would be the appropriate forum for that. If they intended that these kinds of orders be issued by the BIA as a group or an individual member of the BIA, they could have said so explicitly, right? They could have said so explicitly. Well, no, it's not explicit that this particular order has to be sent back. However, there's nothing to say again that this type of case requires the Board to send it back. There was really nothing left for the Board to do. How long would it take, if we were to put this case on hold, how long would it take to dot the jurisdictional I's and cross the jurisdictional T's in this case? If it were remanded to the Board? If we put it on hold and say, gave the government time to finalize the order in accordance with if it chose to do so in accordance with Noriega-Lopez to get the matter back to the IJ, have the IJ issue an order. Go through the steps. I really don't know for sure, Your Honor, but I would estimate that it would be at least six months to a year, maybe. I really don't know. There's really no way for me to answer that. And I certainly don't want to bind the Board or the immigration judge to a timeline that I happen to set without actually knowing. But it would be at least several months. And again, what it's doing is just... I don't understand why. You said the IJ has no discretion. Presumably, if the case comes back up, there would be no discretion on the Board's part either. Why is it just a matter of shuffling papers? It would be done in two weeks. Well, again, this... I'm not saying the government wants to do that. Maybe it should just not do it. But if there's a jurisdictional problem, we occasionally have these things with this Court. We hope to put the case on hold and see if this Court is willing to cure the jurisdictional defect. I'm not exactly sure why this couldn't be done by the time you fly back to Washington. Why it couldn't be done. Well, again, I really have no way of binding them to any sort of timeline. I do know that the Court in question I believe this was held at the San Francisco Immigration Court is very busy. And it would still have to be re-docketed at the Board and re-docketed at the then the Board would have to issue an order, the immigration judge potentially would have to issue an order. That does take time, Your Honors. And so I can't necessarily bind you to bind them to any particular time period. I don't feel so bad about our immigration backlog anymore. I'm sorry? I don't feel so bad about our immigration case backlog. Well, you know, we're all in the same backlog, Your Honor. We certainly, if there were a court order... We're not in the same backlog because the decision was made to bypass the BIA. So I think like four years ago we had 800 of these cases on our docket. Now we've got 5,000. It's more like 8,000. More like 8,000. Well, the backlog has moved from the Board. Well, it hasn't moved. It's just been shot over here. The Board hasn't looked at any of them. They've just got this stamp, you know. Why don't you just close five more? I don't think I'm going to comment on that, Your Honor. Is there any other questions? Your Honors? Okay, I'll just sum up. Accordingly, based on the discussion today, the instant petition for review should be denied. Thank you. Thank you. I think we've heard all you really have to say, haven't we? Or you want two bites at argument? No, you owe us. You owe us time. But if you're going to get up to the podium, I have a question for you. It's up to you. How do you respond to the government's argument that there's a difference between a case involving cancellation of removal and a case like this where there's a concession of removability for jurisdictional purposes? Discussing orders of deportation or orders of removal in the statute. In this case, and who has authority to do that? In Noriega-Lopez, they said for purposes of this decision... I know what Noriega-Lopez said. I know what they said. I want to know your response to her argument that there's a difference between a case involving cancellation of removal, which was Noriega-Lopez, and this case where your client conceded removability. What's your response? There is no difference for purposes of this argument because even if somebody concedes that they're removable, that is not an order. There has to be an order of finding of the judge following an evidentiary hearing if the person's applying for any form of relief. If the person fails, then the person's order is removed. Here, the immigration judge never ordered removal. They, in fact, granted Mr. Molina Camacho lawful permanent residence status on a hardship waiver. He won his case before the immigration judge. So there has to be an order of removal. It doesn't matter whether it's in cancellation, deportation, or whether there's been a concession that the person on the part of the alien... The bottom line is they're trying to stay here. That's correct, Your Honor. And the immigration judge found that they had made the case that showed they were entitled. And under the... I mean, I think that Congress has to be held to the statutes which they pass. And in this case, they find that only immigration judges have the authority to issue orders of removal or deportation in the first instance. Well, that hasn't happened in this case. That's your third bite. Thank you, Your Honor. Okay, now we go to Forest Conservation Council versus the United States Forest Service.
judges: Pregerson, Kozinski, Hawkins